Jane T. BLACKBURN, Appellant,

v.

COLUMBIA MEDICAL CENTER OF ARLINGTON SUBSIDIARY, L.P. d/b/a Columbia Medical Center of Arlington, Appellee.

No. 2–00–426–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 27, 2001.

Taylor, Olson, Adkins, Sralla & Elam, L.L.P., Tim G. Sralla, The Wagner Law Firm, James P. Wagner, Fort Worth, for Appellant.

Cooper & Scully, P.C., R. Brent Cooper, Diana L. Faust, Ashley E. Frizzell, Dallas, for Appellee.

Panel A: DAY, HOLMAN, and GARDNER, JJ.

## OPINION

GARDNER, Justice.

### I. Introduction

In this medical malpractice case, Appellant Jane T. Blackburn, plaintiff in the

trial court, advances three issues and appeals from two summary judgments granted in favor of Appellee Columbia Medical Center of Arlington Subsidiary, L.P. d/b/a Columbia Medical Center of Arlington ("Columbia").[1] In her first and third issue, Blackburn contends that Columbia was not entitled to judgment on its traditional motion for summary judgment because it failed to negate the existence of a joint enterprise with Medical Imaging of Dallas ("Medical Imaging"), the radiology group used by Columbia, as a matter of law. In her second and third issue, Blackburn further contends that Columbia was not entitled to summary judgment on its no-evidence motion because she produced more than a scintilla of evidence raising genuine issues of material fact on each of the four elements of a joint enterprise with Medical Imaging. We affirm.

## II. Factual and Procedural Background

Blackburn's suit against Columbia and the other defendants alleged that, on December 22, 1996, Blackburn was involved in a motor vehicle accident in which she sustained injuries to her head, neck, and upper torso. Emergency medical personnel at the scene transported her to Columbia Medical Center. Upon arrival, Blackburn gave a history of prior cervical fusions and complained of upper back and head pain, chest pain, and breathing difficulties.

Multiple x-rays and plain films of Blackburn's spine were obtained in Columbia's radiology department. Columbia's radiology department was owned and operated by the hospital, but radiological services were provided by licensed radiologists furnished by Medical Imaging under a contract with Columbia. There was no radiologist on duty that evening, but the emergency room physician, Dr. DelPrincipe, reviewed the x-rays and plain films and noted his observations of the cervical portion of Blackburn's spine. Dr. DelPrincipe diagnosed Blackburn with cervical strain and soft tissue contusions, prescribed pain medication, applied a soft cervical collar, and instructed Blackburn to follow up with her primary care physician in two days.

On the following day, Dr. Phyllis Noss, a radiologist employed by Medical Imaging in Columbia's Radiology Department, reviewed Blackburn's x-rays and plain films and found no fracturing.[2] Dr. Noss did not recommend any further action with regard to Blackburn's treatment.

As instructed by Dr. DelPrincipe, Blackburn visited her primary care physician Dr. Nawrocki, who began treating Blackburn with muscle relaxants, anti-inflammatories, and physical therapy. Within a few weeks, Blackburn alleged, she developed symptoms in her lower extremities. These symptoms included pain, spasms, increased turning in and downward of her feet, and continued pain in her neck and left arm. Blackburn also complained of a decreased ability to stand and walk without assistance.

1. Upon granting the motions for summary judgment, the trial court severed Blackburn's claims against Columbia and entered a final judgment that she take nothing as to it.

2. Specifically, Dr. Noss reported the following clinical impression of the cervical portion of Blackburn's spine:
 The patient has undergone interbody fusion at the C5–6 and C6–7 levels. With flexion, there is about 2mm anterior subluxation of C4 relative to C5 which reduces with neutral or extension positioning. The fusion is complete without evidence of nonhealing or fracture. Mild neuroforaminal narrowing bilaterally is seen at the C5–6 and C6–7 levels due to uncovertebral joint hypertrophy. No fracture or other bony abnormality is seen. The prevertebral soft tissues are normal in appearance.

Blackburn maintains that as a result of her alleged worsening condition, she went to Arlington Memorial Hospital's emergency room on January 25, 1997. She was examined by an emergency room physician, and further x-rays were reviewed by radiologist Dr. Thomas Telle. Dr. Telle noted only mild bulges in a few of the cervical vertebra and some narrowing of the spinal column.[3] Blackburn was released with a prescription for anti-dizziness medication and a recommendation to follow up with her primary care physician.

According to Blackburn, her condition continued to deteriorate, and she sought further treatment over the next several months. In September 1997, a new x-ray by a chiropractor revealed that Blackburn had suffered a fracture at her third cervical vertebra. At this point, Blackburn claims she required the assistance of a cane and leg brace to walk. On October 31, 1997, corrective surgery was performed.[4]

Blackburn sued Columbia Medical Center, Dr. Noss, Arlington Memorial Hospital, and Dr. Telle. She alleged that Dr. Noss was negligent for misinterpreting Blackburn's radiographic studies; failing to reconcile her interpretation of the radiographic studies with Dr. DelPrincipe's interpretation; failing to report discrepancies between her interpretation of the radiographic studies and Dr. DelPrincipe's interpretation; failing to diagnose and re-

port cervical spine mobility and possible acute traumatic instability; failing to recommend or order a cervical CT scan; and failing to recommend or order a neurological consultation. Blackburn further alleged that Dr. Noss was a partner, principal, or employee of Medical Imaging and was acting on behalf of Medical Imaging when she interpreted Blackburn's x-rays. Under that theory she asserted that any negligence of Dr. Noss was imputed to Medical Imaging.

Blackburn's only theory of liability against Columbia was for the actions of Dr. Noss under a theory of "joint enterprise" between Columbia and Medical Imaging. Specifically, Blackburn alleged Columbia was engaged in a joint enterprise in the operation of its Radiology Department with the radiology group of physicians known as Medical Imaging with whom Dr. Noss was a partner, principal, or employee. Under that theory, Blackburn asserted the alleged negligence of Dr. Noss was imputed to Columbia.[5]

Columbia filed both a no-evidence motion for summary judgment and a traditional motion for summary judgment. *See* Tex.R. Civ. P. 166a(c), (i). In its no-evidence motion, Columbia contended that Blackburn presented no evidence of any of the essential elements of her claim of joint enterprise liability:

1. an agreement, express or implied, between the Hospital and Medical Imaging of Dallas;

---

3. Dr. Telle reportedly found, "a mild central bulge at C4–5," "a bony narrowing of the 5–6 and 6–7 foramina," and a "slight stenosis . . . at the 6–7 level related to the bony hypertrophic changes."

4. A neurosurgeon performed a reduction and stabilization of the dislocated cervical spine; posterior unlocking of the facets that had fused as a result of persistent and prolonged dislocation; posterior stabilization and instrumentation with plates; posterior fusion using

a bone graft from the left iliac crest; and placement of Garner Wells tongs.

5. Blackburn made the same allegations under the same theory of liability against Arlington Memorial Hospital and Dr. Telle, the radiologist who reviewed her x-rays at that hospital. Dr. Telle was an associate of Radiology Associates of Tarrant County, which performed radiology services for Arlington Memorial. Blackburn claimed a joint enterprise between Radiology Associates and Arlington Memorial.

2. a common purpose to be carried out between the Hospital and Medical Imaging of Dallas;

3. a community of pecuniary interest in that purpose between the Hospital and the Group;

4. an equal right to a voice in the direction of the enterprise, which gives an equal right of control to both the Hospital and the Group.

5. that acts of omissions of Dr. Noss breached the standard of care;

6. that acts or omissions of Dr. Noss were a proximate cause of any of [Blackburn's] alleged injury [sic];

7. that Medical Imaging of Dallas had the right to exercise control over the details of Dr. Noss' practice of medicine or the means and details of the performance of that practice; [or]

8. that Medical Imaging of Dallas was vicariously liable for the actions of Dr. Noss under an agency or respondeat superior theory.

In its traditional motion for summary judgment, Columbia Medical Center attached deposition excerpts from Dr. Bruce Railey, Dr. Puthuparambil T. Chacko, and Dr. Noss, which, it contended, conclusively established the following:

1. that a community of pecuniary interest in a common purpose did not exist between the Hospital and Medical Imaging of Dallas;

2. that an equal right to a voice in the direction of the enterprise, which gives an equal right of control to both the Hospital and the Group did not exist;

3. that Medical Imaging of Dallas is not vicariously liable for the actions of Dr. Noss; and

4. that Medical Imaging of Dallas did not have the right to exercise control over the details of Dr. Noss' practice of medicine.

Blackburn filed a response to both of Columbia's motions for summary judgment, attaching as proof the affidavits of Dr. Kendall Jones and Dr. Patrick Johnson, deposition excerpts of Dr. DelPrincipe, Dr. Noss, Dr. Bruce Railey,[6] and Dr. Puthuparambil Chacko,[7] and various medical records from Columbia Medical Center. In her response, Blackburn argued that her summary judgment evidence established that Dr. Noss was negligent; that her negligent conduct was a proximate cause of Blackburn's injuries; that Columbia Medical Center and Medical Imaging of Dallas were engaged in a joint enterprise in the Radiology Department at Columbia; and that Dr. Noss was the agent of Columbia, Medical Imaging, and/or both, and was acting within the scope of such agency while providing radiology services to Blackburn. The trial court granted both summary judgments in favor of Columbia, from which Blackburn appeals.

### III. DISCUSSION

#### A. Issues

Blackburn advances two arguments. First, Blackburn contends that, because Columbia failed to negate the existence of a joint enterprise with Medical Imaging as a matter of law, it was not entitled to judgment on its traditional motion for summary judgment. Secondly, Blackburn argues that, because her summary judg-

---

6. Dr. Railey was a Medical Imaging partner and was designated Chief Radiologist/Medical Director under the agreement.

7. Dr. Chacko was a Columbia Medical Center employee and was designated as Director of Radiology under the agreement.

ment evidence raised genuine issues of material fact as to each of the four elements of joint enterprise, Columbia was not entitled to judgment on its no-evidence motion for summary judgment.

Columbia responds that the trial court properly granted summary judgment in its favor because it conclusively negated two of the four essential elements of the theory of joint enterprise liability. Specifically, Columbia maintains: (1) that no community of pecuniary interest existed between Columbia and Medical Imaging, and (2) that no equal right of control existed between Columbia and Medical Imaging concerning the conduct at issue in the case. We agree with Columbia that it conclusively negated the element of community of pecuniary interest, and that Blackburn provided no evidence of the element. Therefore, we need not address the issue of equal right of control.

### B. Standard of Review

#### 1. Traditional Summary Judgment

In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999); *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *Great Am.*, 391 S.W.2d at 47.

■ In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence are disregarded and the evidence favorable to the nonmovant is accepted as true. *Rhone–Poulenc*, 997 S.W.2d at 223; *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am.*, 391 S.W.2d at 47.

■ A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). To that end, the defendant-movant must present summary judgment evidence that conclusively negates an element of the plaintiff's claim. Once that evidence is presented, the burden shifts to the plaintiff to put on competent controverting evidence that proves the existence of a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

#### 2. No–Evidence Summary Judgment

■■ After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex.R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; In re Mohawk Rubber Co.*, 982 S.W.2d 494, 497–98 (Tex.App.—Texarkana 1998, orig. proceeding). The trial

court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact as to the challenged element. *See* TEX.R. CIV. P. 166a(i) cmt.; *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 71 (Tex. App.—Austin 1998, no pet.).

A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Frazier v. Yu*, 987 S.W.2d 607, 610 (Tex.App.—Fort Worth 1999, pet. denied); *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.—San Antonio 1998, pet. denied). We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore*, 981 S.W.2d at 269.

Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). A genuine issue of material fact is raised by presenting evidence on which a reasonable jury could return a verdict in the nonmovant's favor. *Moore*, 981 S.W.2d at 266; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (interpreting FED.R.CIV.P. 56).

## C. Joint Enterprise

Generally, a hospital is not liable for injuries resulting from the negligence of a physician who is an independent contractor rather than an employee or servant of the hospital. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex.1998). Whether a physician is an independent contractor rather than an employee depends upon whether the employer has the right to control the progress, details, and methods of operation of the physician's work. *Gladewater Mun. Hosp. v. Daniel*, 694 S.W.2d 619, 621 (Tex.App.—Texarkana 1985, no writ). The employer must control not only the end result but also the means and details of the accomplishment of the result. *Id.* Generally, the diagnoses and performance of medical procedures are within the province of the physician's judgment and not subject to a hospital's control. *See Hunte v. Hinkley*, 731 S.W.2d 570, 572 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). The fact that a physician has staff privileges and agrees to abide by the hospital's policies and procedures while utilizing its equipment and facilities does not affect the physician's status as an independent contractor. *Drennan v. Community Health Inv. Corp.*, 905 S.W.2d 811, 819 (Tex. App.—Amarillo 1995, writ denied).

Blackburn does not contend that Dr. Noss was acting as an employee of Columbia so as to invoke the doctrine of *respondeat superior*. Instead, Blackburn seeks to impose vicarious liability on Columbia by imputing the liability of Dr. Noss to Medical Imaging and, in turn, imputing Medical Imaging's liability to Columbia under the theory of joint enterprise. We disagree with Blackburn, however, that the summary judgment evidence provided raises the issue of joint enterprise.

 Joint enterprise liability, as applied to joint undertakings, makes "each party thereto the agent of the other and thereby ... hold[s] each responsible for the negligent act of the other." *Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 613 (Tex.2000); *Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 14 (Tex.1974). Although earlier Texas cases had applied a broad interpretation of the doctrine of joint enterprise including situations involving family or friendly cooperation and accommodation, in *Shoemaker,* the Texas Supreme Court limited the doctrine to the definition in comment c of the Restatement (Second) of Torts section 491. *Id.* at 17. Comment c expressly sets forth four essential elements for the doctrine of joint enterprise, and limits application of the doctrine to enterprises having a business or commercial purpose. The Restatement states, in pertinent part:

> [t]he elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Walker v. Messerschmitt Bolkow Blohm,* 844 F.2d 237, 240 (5th Cir.1988) (quoting RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)); *see also Blount v. Bordens, Inc.,* 910 S.W.2d 931, 933 (Tex.1995); *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995).

### 1. Agreement, express or implied, among the members of the group

The first element of the theory of joint enterprise, as adopted in *Shoemaker,* requires that the two entities involved have an agreement, either express or implied.

*Shoemaker,* 513 S.W.2d at 16–17; *Rhea v. Williams,* 802 S.W.2d 118, 120–21 (Tex. App.—Fort Worth 1991, writ denied). It is undisputed that Medical Imaging and Columbia had an agreement. Prior to Blackburn's treatment at Columbia, Medical Imaging and Columbia executed a diagnostic radiology agreement under which Medical Imaging became obligated to provide physicians specializing in radiology, referred to as "Associates," to perform radiology services on patients in Columbia's radiology department. The agreement specifically provided that Medical Imaging and its Associate physicians would at all times act as independent contractors under the agreement and would not, under any circumstances, act or hold themselves out to third parties as employees or agents of Columbia in the provision of radiology services.

Dr. Bruce Railey, managing partner of Medical Imaging, testified by deposition that Dr. Noss was a principal in Medical Imaging and was acting on behalf of Medical Imaging when she performed her interpretation of Blackburn's x-rays. Other summary judgment evidence also established that Dr. Noss was a partner in Medical Imaging. True and correct copies of the agreement between Columbia and Medical Imaging and Dr. Noss's employment contract with Medical Imaging were attached to Blackburn's response to Columbia's motions for summary judgment. The summary judgment evidence demonstrates that there was an express agreement between the parties.

### 2. A common purpose to be carried out by the group

 A joint enterprise also requires that the two entities involved have a common purpose. *Shoemaker,* 513 S.W.2d at 16–17; *St. Joseph Hosp. v. Wolff,* 999 S.W.2d 579, 587 (Tex.App.—Austin 1999,

pet. granted). As evidenced by the written agreement between Columbia and Medical Imaging, the purpose of the department of radiology at Columbia was to provide radiological services for patients of the hospital.

The stated purpose of the written agreement between Medical Imaging and Columbia was to procure the "orderly and efficient delivery of quality radiology services" by Medical Imaging's Associates duly licensed to practice medicine in the State of Texas, appointed by Columbia's medical staff, and given privileges in radiology at Columbia. The agreement further provided that the "prime objective" of Medical Imaging under the agreement was the efficient and effective delivery of radiology services to the Hospital's patients. The summary judgment evidence thus shows that both Columbia and Medical Imaging shared a general common purpose of providing radiological services to Columbia's patients.

### 3. Community of pecuniary interest in the common purpose

■■■ A community of pecuniary interest is essential to the existence of a joint enterprise. *Blount,* 910 S.W.2d at 933; *Shoemaker,* 513 S.W.2d at 16–17; *Greg Lair, Inc. v. Spring,* 23 S.W.3d 443, 448 (Tex.App.—Amarillo 2000, pet. denied); *Ely v. Gen. Motors Corp.,* 927 S.W.2d 774, 779 (Tex.App.—Texarkana 1996, writ denied). The supreme court has limited the element of "common purpose" to those endeavors in which the parties share a "community of pecuniary interest" involving a business or pecuniary purpose. *Shoemaker,* 513 S.W.2d at 17. "Common" in this context means sharing without special or distinguishing characteristics. 1 TEXAS TORTS AND REMEDIES § 4.05[3] (J. Hadley Edgar, Jr. & James B. Sales eds., 2001)

(comparing *Ely,* 927 S.W.2d at 779 with *Greg Lair, Inc.,* 23 S.W.3d at 448).

On the one hand, Blackburn contends that her summary judgment evidence establishes a fact issue as to community of pecuniary interest between Medical Imaging and Columbia so as to make Columbia vicariously liable for the negligence of Dr. Noss under the theory of joint enterprise liability. Specifically, Blackburn relies on deposition excerpts of Dr. Railey and Dr. Chacko in support of her argument that the summary judgment record establishes the existence of a commercially and financially "symbiotic" relationship between the two entities.

Columbia, on the other hand, argues that the summary judgment record wholly fails to show evidence of a community of pecuniary interest between Columbia and Medical Imaging because there was no evidence that they agreed to share in profits and losses. In this regard, Columbia relies principally upon statements from cases discussing sharing of financial "benefits and costs." *See Shoemaker,* 513 S.W.2d at 14 (quoting PROSSER, LAW OF TORTS § 69, 458 (4th ed. 1971)) (finding that a joint venture exists "[w]here the enterprise is for some commercial or business purpose, and particularly where the parties have agreed to share profits and losses."). However, we decline to accept such a narrow interpretation of the element of community of pecuniary interest.

### a. No requirement to show sharing of profits and losses

We are mindful that the doctrines of partnership, joint venture, and joint enterprise are closely related and that those doctrines each spring from the roots of partnership law. *Shoemaker,* 513 S.W.2d at 16; *see also Walker,* 844 F.2d at 242. Those doctrines, however, are not without distinction. The *Shoemaker* court described the distinction between a partner-

ship, a joint venture, and a joint enterprise, as follows:

> By way of history, we know that the law of partnership and the principles of agency serve as a foundation for the doctrine of joint enterprise. A step away from partnership is joint venture, a concept that is generally more limited in time and in purpose than a partnership. While a joint venture encompasses fewer objectives than a partnership, both exist in a business or commercial setting. *Joint enterprise, which may be considered a third stage of development,* is an unique creation of American jurisprudence. American courts have applied this doctrine almost solely in the field of automobile law; in interpreting joint enterprise, some courts have retained the business character of joint venture as a requirement, while others have manifested a broader view of the doctrine. The pecuniary interest requirement has been most often imposed in the context of imputed contributory negligence and it has been said that this is the direction toward which the courts are tending to move.

*Shoemaker,* 513 S.W.2d at 16 (emphasis added) (citation omitted). After making this distinction, the *Shoemaker* court went on to adopt the commercial characterization of joint enterprise as set forth in the Restatement (Second) of Torts, effectively limiting the traditionally broad application of joint enterprise liability to enterprises having a business or pecuniary purposes. *Id.* at 17.

■■■ As a general rule, joint venture is governed by the same rules as a partnership and vice versa. *Ben Fitzgerald Realty Co. v. Muller,* 846 S.W.2d 110, 120 (Tex.App.—Tyler 1993, writ denied); *see also, Bank One v. Stewart,* 967 S.W.2d 419, 445 (Tex.App.—Houston [14th Dist.] 1998, pet. denied). According to the Texas

Supreme Court, to establish a partnership or joint venture, a party must establish each of the following elements: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise. *Coastal Plains Dev. Corp. v. Micrea, Inc.,* 572 S.W.2d 285, 287 (Tex. 1978). Sharing in profits and losses is an essential element of a joint venture. *Id.*

■■■ As characterized by the supreme court in *Shoemaker,* joint enterprise is not the same as joint venture and is not governed by the rules applicable to joint ventures. As noted above, the supreme court has established a separate set of elements for joint enterprise that are similar to, but different from, the elements of joint venture enterprise. Sharing of profits and losses is *not* listed as one of the essential elements of joint enterprise. The court of appeals' decision in *Able,* affirmed by the supreme court, noted that "the elements required to establish a joint enterprise, as distinguished from a joint venture, do not require proof of the sharing of profits and losses." *Tex. Dep't Transp. v. Able,* 981 S.W.2d 765, 769 (Tex.App.—Houston [1st Dist.] 1998), *aff'd,* 35 S.W.3d 608 (Tex.2000) (citing *Shoemaker,* 513 S.W.2d at 16–17); *see also Wolff,* 999 S.W.2d at 586 n. 10 (noting proof of sharing in profits and losses is not required for joint enterprise).

In *Able,* the supreme court held that sufficient evidence supported the jury's finding that the Texas Department of Transportation ("TxDOT") and the Houston Metropolitan Transit Authority were engaged in a joint enterprise as to a particular highway project. 35 S.W.3d at 614. In reaching its decision as to the element of community pecuniary interest, the court looked to evidence that the master agreement between TxDOT and the transit au-

thority plainly recognized that the project contemplated a joint effort that utilized federal, state, and local funds; shared resources in furtherance of the ultimate purposes of providing mass transit; and realized an economic gain on the investment. *Id.* The court also found it noteworthy that monetary and personnel savings produced from pooling of resources might have been substantial and that the project was not a matter of mere friendly or family cooperation and accommodation. *Id.*

Citing its prior decision in *Shoemaker,* the *Able* court reaffirmed that there must be a community of pecuniary interest in the *purpose* of the joint undertaking—*not* necessarily in the sharing of profits and losses. *Id.* As noted above, the *Able* court relied principally on the "Master Agreement," which contained a specific provision contemplating a joint investment of resources by both entities in furtherance of the ultimate purposes of providing mass transit and realizing economic gain on the investment. *Id.*

■■■ We fully acknowledge that the common purpose to be carried out by the group may certainly include making profits. *Shoemaker* expressly noted that some courts have articulated the element of community of pecuniary interest in terms "such as a 'common business purpose,' a 'common pecuniary objective,' or a 'venture for profit.' ...." *Id.* at 17. However, we do not read *Shoemaker* as requiring sharing of profits and losses in *every* case in order to establish the pecuniary interest element. Just because an agreement does not contemplate sharing of profits and losses, as a common purpose to be carried out by the group, does not mean that the pecuniary interest prerequisite is not met.

Columbia relies upon the Fifth Circuit Court of Appeals' decision in *Walker* as supporting its argument that sharing of profits and losses is an evidentiary prereq-

uisite to the establishment of a community of pecuniary interest. 844 F.2d at 242. In *Walker,* the court held that the independent contractor/principal relationship between the operator and owner of a helicopter precluded the possibility of imputing joint enterprise liability for negligence to the owner for the operator's negligence. In reaching its holding, the court recognized that the doctrines of both joint venture and joint enterprise liability shared their roots in partnership law. *Id.* The court further noted that a fundamental distinction between partnerships/joint ventures and independent contractor/principal relationships is that a partnership/joint venture agreement involves the sharing of profits and losses. *Id.* The court then concluded that, while this distinction had only been previously made by Texas courts in the context of partnerships and joint ventures, "the same reasoning applies to the closely related doctrine of joint enterprise." *Id.*

The *Walker* court did not address sharing of profits and losses in the context of supplying the community of pecuniary interest element for purposes of establishing joint enterprise liability. Rather, *Walker* held that the mere existence of an independent contractor/principal relationship generally precluded the imposition of joint enterprise liability. *Id.* Thus, *Walker* does not support Columbia's argument that evidence of sharing profits and losses is *always* a prerequisite to the establishment of a community of pecuniary interest for purposes of imposing joint enterprise liability.

Based on the foregoing, while we acknowledge the absence of any agreement to share profits and losses between these parties, lack of such an agreement is not fatal to the theory of joint enterprise and does not preclude suit against Columbia on that theory as a matter of law. We must,

therefore, determine whether the summary judgment record contains any other evidence of a community of pecuniary interest in the common purpose to be carried out by the group, absent an agreement to share profits and losses, which raises an issue of material fact on this element to preclude summary judgment.

*b. No evidence of community of pecuniary interest*

■ The agreement between Columbia and Medical Imaging provides that Medical Imaging, as an independent contractor, is obligated to "continually work to improve the quality of and maintain a reasonable cost for medical care furnished to Hospital's patients in the Radiology Department." The agreement places upon Medical Imaging the exclusive responsibility for payment of its respective income tax, vacation pay, sick leave, unemployment insurance, worker's compensation, retirement benefits, disability benefits, and any other employee benefits. The agreement expressly states that Medical Imaging and its Associates shall not incur any financial obligation on behalf of Columbia without prior written approval by Columbia's president/chief executive officer. The agreement makes Medical Imaging responsible for all personnel and professional expenses of its Associates.

Columbia is exclusively responsible for employing or assigning all non-physician personnel necessary for the operation of the Radiology Department and is, likewise, exclusively responsible for providing their salaries, wages, taxes, insurance, worker's compensation insurance, and other expenses and benefits incidental to their employment. Medical Imaging is expressly forbidden to bill hospital patients for any care rendered by Columbia's non-physician personnel. During the term of the agreement, Columbia provides the space, utilities, equipment, supplies, and services nec-

essary for the proper operation of the Radiology Department. The hospital has the responsibility to maintain the necessary equipment in good order and repair. Finally, Medical Imaging is responsible for establishing its own schedule of fees and services and its sole source of compensation is its own collection of fees from its patients.

By deposition testimony, Dr. Railey confirmed the terms of the agreement as described above. He stated that, under the agreement, he was given the role of Chief Radiologist/Medical Director and that, as a partner of Medical Imaging, he had no duties concerning the hospital's budget and was never asked to consult on the hospital's budgetary matters. He testified that Medical Imaging paid all of its own employee expenses, including salaries, benefits, and insurance, and that Medical Imaging received no monetary benefits from the hospital except the ability to bill patients for radiological services. He further testified that, under the agreement, Medical Imaging and Columbia were responsible for their own finances and that one party could not be held responsible for any financial failure of the other party.

Contrary to Blackburn's argument, Dr. Railey's testimony did not amply demonstrate a community of pecuniary interest among the hospital and Medical Imaging. Dr. Railey merely agreed that the contract between Columbia and Medical Imaging (1) was a convenience to Columbia and its patients because it eliminated the need to send patients elsewhere to have radiological services performed and (2) benefitted Medical Imaging because the hospital provided and maintained the radiology machinery, thereby eliminating the need for Medical Imaging to invest money to purchase and maintain equipment. This evidence supports the conclusion that the parties generally benefitted from the ar-

rangement, but we do not interpret this testimony as affording even a scintilla of evidence of a community of pecuniary interest in the purpose of the radiology services agreement.

Dr. Chacko's deposition testimony, also a part of the summary judgment record, stated that, in the absence of Medical Imaging's provision of physician services in Columbia's radiology department, Columbia would be required to have a radiologist "in-house or . . . on call to provide radiology service." He further conceded that Medical Imaging had to provide no equipment in the radiology department at Columbia. He gave no other testimony relevant to establishing a community of pecuniary interest.

Both Dr. Railey and Dr. Chacko testified regarding the same symbiotic relationship. Columbia benefitted from its agreement with Medical Imaging by staffing its radiology department in-house, eliminating the need for patients to obtain radiological services off premises, and Medical Imaging benefitted by letting the hospital provide the facilities and equipment for Medical Imaging physicians to provide radiological services. However, evidence of such general benefits does not establish a community of pecuniary interest in the common purpose to be carried out by the group.

By way of contrast, in *St. Joseph Hospital*, St. Joseph entered into an agreement with the Central Texas Medical Foundation, which operated accredited medical-residency training programs, through which St. Joseph assigned surgical residents to train in surgery at Brackenridge Hospital in Austin. 999 S.W.2d at 583. The court of appeals upheld a judgment against St. Joseph based on joint liability with the foundation for injury to a patient caused by negligence of a resident. The record contained ample evidence that both the hospital and the foundation had an interest in creating an integrated program with reduced costs and duplications. The purposes of this program were: 1) to gain an accredited program which would attract qualified residents, 2) to receive higher medicare payments for the hospital, and 3) to share in other intangible benefits. *Id.* at 588. The record also reflected that the foundation and St. Joseph shared to some extent in financial benefits and costs. For example, the hospital paid residents an annual stipend, and the foundation paid a housing allowance, billed patients while remitting a portion of the proceeds to the hospital for the residents' services. *Id.* at 589. Thus, the court held that the evidence supported the jury's finding of a community of pecuniary interest in the common purpose of the program. *Id.*

In determining whether a community of pecuniary interest existed such as to give rise to a joint enterprise, the supreme court in *Able* focused upon evidence showing pooling of efforts and monetary resources between entities to achieve common purposes, namely reduction in costs and contemplation of economic gain by approaching the project as a joint undertaking. 35 S.W.3d at 614. The master agreement in *Able* clearly acknowledged these purposes and was relied upon by the court in holding that some evidence of a joint enterprise existed between the contracting parties. *Id.* *Able* confirms that more is required for a community of pecuniary interest than a generally shared business purpose. *Id.*

Here, there was absolutely no evidence regarding either party's pecuniary or monetary interest in the agreement, much less a *community* of pecuniary interest. In fact, the summary judgment evidence provided conclusively disproves any community of pecuniary interest, as it supports an independent contractor relationship. Fur-

ther, there was no evidence to show a sharing of resources, pooling of funds, monetary investment, costs or benefits to either party. Nothing more than limited evidence of mere convenience to the parties arising from the arrangement and a shared general business interest is shown.

Medical Imaging's status as an independent contractor under the agreement supports this conclusion. The San Antonio Court of Appeals addressed an analogous set of facts in *Texas Department of Transportation v. City of Floresville Electric Power & Light System,* and held that TxDOT could not be held liable to indemnify an independent contractor for negligence under a theory of joint enterprise liability. 53 S.W.3d 447, 456 (Tex.App.—San Antonio 2001, no pet. h). Specifically, TxDOT had entered into a contract with Payne Electronic Service Company ("PES"), which agreed to perform maintenance repairs on TxDOT traffic signals in multiple Texas counties. PES was paid by the number of poles it completed. The contract provided that PES was an independent contractor with respect to TxDOT. A PES employee was electrocuted when the City of Floresville Electric Power & Light System ("FELPS") was not notified that work was to be performed on the power line and failed to de-energize the power line. The representative of the decedent's minor son sued FELPS, which filed a cross-claim for indemnity against TxDOT. On interlocutory appeal, the San Antonio court distinguished the supreme court's decision in *Able:*

> In *Able,* the Texas Supreme Court relied upon evidence that the state highway had been a joint effort between Metro and TxDOT using federal, state, and local funds. The project involved substantial sums of money and contemplated a sharing of resources in order to make better use of the money. The evidence demonstrated a substantial

economic gain from the pooling of resources through monetary and personnel savings.

> In the instant case, TxDOT hired PES to perform maintenance on its traffic signal poles. PES was paid by the number of poles it completed. There was no pooling of resources or pooling of efforts. *TxDOT simply hired PES to perform work as an independent contractor. Therefore, there was no community of pecuniary interest such as to give rise to a joint enterprise.*

*Id.* (emphasis added) (citations omitted); *see also Ely,* 927 S.W.2d at 779 (finding no pecuniary interest in a common purpose under a franchise agreement where one party was selling vehicles at wholesale and the other at retail, even though parties shared general business interest in marketing new cars).

The summary judgment evidence here established that Columbia simply contracted with Medical Imaging as an independent contractor to provide radiological services for Columbia's patients. Each party incurred its own costs and received separate benefits. Medical Imaging billed and collected from the patients for its own professional services. Columbia billed and collected from patients for use of its equipment and facilities. There was no evidence of sharing of financial benefits, nor was there any evidence of sharing or pooling of resources or efforts between Columbia and Medical Imaging. At most, the evidence suggests that the parties shared a general business interest in providing radiological services. This evidence conclusively disproves the element of joint enterprise. Additionally, the evidence provides that Blackburn has failed to prove an element of her claim.

Viewing the summary judgment record in the light most favorable to Blackburn,

the party against whom summary judgment was rendered, and disregarding all contrary evidence and inferences, we believe that Blackburn failed to bring forward more than a scintilla of probative evidence that raises a genuine issue of material fact regarding the existence of a community of pecuniary interest between Columbia and Medical Imaging. *Moore,* 981 S.W.2d at 269; *Szczepanik,* 883 S.W.2d at 649.

We hold that the trial court properly granted both the traditional and no evidence summary judgments in favor of Columbia on the ground of lack of a community of pecuniary interest. Columbia's summary judgment evidence conclusively disproved an essential element of joint enterprise. Further, Blackburn has failed to raise an issue of material fact as to an essential element of joint enterprise. Having determined that the trial court properly granted summary judgment we need not address Blackburn's argument regarding the element of equal right of control among members of the alleged enterprise. *Harwell,* 896 S.W.2d at 173. We overrule Blackburn's first, second, and third issue.

## IV. CONCLUSION

Having found that the trial court properly granted both of Columbia's motions for summary judgment, we affirm the trial court's judgment.