**Opinion issued July 23, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-01082-CV

———————————

## IN THE INTEREST OF H.L.B., T.K.B., AND C.L.B., CHILDREN

---

### On Appeal from the 313th District Court
### Harris County, Texas
### Trial Court Case No. 2010-01752J

---

## MEMORANDUM OPINION

In this accelerated appeal, appellant, Sherri Tomlinson, challenges the trial court's order, entered after a bench trial, terminating her parental rights to her three minor children. In three issues, appellant contends that: (1) the evidence is legally insufficient to support the trial court's findings that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that

endangered their physical or emotional well-being,[1] engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being,[2] and failed to comply with the provisions of a court order that specifically established actions necessary for her to obtain the return of the children;[3] (2) termination of the parent-child relationship was not in the children's best interests;[4] and (3) the trial court abused its discretion in denying appellant's request to review notes used to refresh the recollection of a witness.

We affirm.

## Background

Jackie Barrentine, the paternal grandmother of the three children, testified that in November 2008 she visited appellant and the three children at the home of her nephew, Clayton Barrentine, in Baytown, Texas. Appellant was living there with her children and her boyfriend, Timothy Comeaux. Barrentine noted that all three children looked "unkempt," and she saw the youngest child playing in "sewage" when she arrived. The other two children were playing outdoors without

---

[1] *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (Vernon 2012).

[2] *See id.* § 161.001(1)(E).

[3] *See id.* § 161.001(1)(O).

[4] *See id.* § 161.001(2).

2

coats even though the temperature was in the 30 degree range. Inside the house, which smelled like marijuana, Barrentine saw appellant, Comeaux, Clayton, and Clayton's wife, Glenda. Barrentine informed appellant that she was taking the children with her to Mississippi, and she did so. The two older children told Barrentine that appellant would leave the children with Clayton and Glenda, who would lock them outside all day during the summer so that they had "to use the bathroom outside." When they arrived in Mississippi, Barrentine noticed that the children were "malnourished" and one had lice. The children also told Barrentine that they sometimes had to sneak food into their room because appellant would often "put them to bed without food."

Barrentine also noted that, in December 2008, one of the children telephoned her and told her that Comeaux was "mean" to the children and they were "terrified" of him. Barrentine explained that the children were often locked in a bedroom for "longer than a few hours" and were forced to defecate and urinate in an Easter basket in a closet. She also noted that Comeaux had called her and threatened her after her initial testimony in the case.

Frances Cook, a licensed counselor, testified that she met the three children when their foster parents brought them in for therapy. The oldest child told her that the children were "restricted to a bedroom" and would often miss school because appellant and Comeaux slept until well into the afternoon. Cook opined

3

that appellant lacked the ability to parent because she "restricted" the children to their bedroom and, "when they needed their mother's attention, they were unable to rouse her to get her to wake up." The child also told Cook that she wanted to stay with her foster parents and did not want to return to her mother, largely because of the presence of Comeaux. The other two children also told Cook that they did not want to return to their mother, but, instead, wanted to stay with their foster parents. Cook opined that the oldest child had become the "parental figure" for her younger siblings and been deprived of a childhood during which she could feel "secure about an adult making the decisions."

Cook further testified that there would likely be a permanent, negative impact on the children if they returned to appellant. She opined that it would be in the children's best interests if appellant's parental rights were terminated and the children were permitted to stay with the foster parents.

Stephanie Jones, a forensic interviewer with the Harris County Children's Assessment Center, testified that she interviewed all three children on January 20, 2011. The oldest child told her that the children had been locked up in a bedroom, had been fed only one meal per day, and had to sneak out of the room to get food from the pantry. If they were caught sneaking out of their room to obtain food, appellant would force them to stand in a corner for three to five hours. Comeaux would often hit the children on their backs and tell them that they were "ugly."

4

The oldest child also found herself taking care of her younger siblings because of the long periods of time that appellant and Comeaux spent sleeping. The oldest child told Jones that appellant had asked her for eight dollars so that she could buy "drugs," and she saw appellant taking "coke," which she described as something white and "foamy" in appellant's nose. All three children spoke with Jones, and their statements were consistent.

Annie Moulder, a school nurse, testified that the oldest child often came to her office with "matted" hair that was not "well kept." Both Moulder and Jennifer Cooper-Fontenot, the child's fourth-grade teacher, testified that after Thanksgiving day, the child was sent to Moulder's office with a strong body odor and dirty clothes, and she told the nurse that appellant had not allowed her to shower in several days. Cooper-Fontenot also noted that the child frequently complained about headaches as a result of "not being fed at home."

Tracy Tanner, the family involvement coordinator at the oldest child's elementary school, testified that the child had told her that she and the other two children were not allowed to eat until Sundays and were rarely allowed to bathe. The child explained that the family dog would "urinate on their clothing," which she then wore to school. Tanner attempted to contact appellant, but was never able to reach her.

Amanda Szabo, the Child Protective Services ("CPS") caseworker assigned to appellant's case, testified that appellant tested positive for cocaine while pregnant with her fourth child. Szabo noted that although one goal of her services was "family reunification," appellant had failed to make progress on her Family Services Plan, resulting in "relative adoption" becoming the primary goal. She opined that it was in the best interests of the children to be adopted by their foster parents.

Appellant testified that shortly after the children's father was incarcerated for the offense of child endangerment, Barrentine took the children to live with her in Mississippi for six to seven months. Barrentine had also taken the children for another six to seven months the following Thanksgiving day after the children had spent a few months with appellant. Appellant explained that the "sewage" that Barrentine saw the children playing in was merely "muddy and nasty" water that had leaked from a drainage pipe beneath the house. Appellant denied the allegation that the children had been confined to a bedroom and denied access to a bathroom. She also stated that the children were never physically abused or disciplined, and the only punishment that they ever received was being told to stand in a corner for roughly thirty to forty-five minutes. Appellant admitted that she had used cocaine while she knew she was pregnant with her fourth child. However, she stated that, through therapy and assistance programs, she had

6

become a different person and it would not be in her children's best interests to terminate her parental rights. She noted that Comeaux would be part of her "support system" if she retained her parental rights, and she would count on him to help raise the children.

The children's foster mother testified that the oldest child had told her that while with appellant, the children had been confined to a back room most of the time, were not allowed to use the bathroom, and had to defecate and urinate in a basket and dispose of the waste through a window. The child also told her that the children did not have clean clothes to wear, Comeaux had slammed her head into a door on one occasion, and appellant and Comeaux "slept a good portion of the day." The child stated that appellant and Comeaux would take her with them when they purchased narcotics, and, when the child had money, appellant would attempt to take it and use it to buy narcotics. The child explained that she "would try to hide the money so mom would not hurt the unborn baby." One of the other children told the foster mother that appellant had him "wear the same clothes for six months straight" without washing them and he had to "use the restroom in the closet or in the baskets."

## Sufficiency of the Evidence

In her first issue, appellant argues that the trial court erred in terminating her parental rights because the evidence is legally insufficient to support the trial

7

court's findings that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and failed to comply with the provisions of a court order that specifically established actions necessary for her to obtain the return of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (Vernon 2012). In her second issue, appellant asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interests. *See id.* § 161.001(2).

***Standard of Review***

A parent's right to "the companionship, care, custody, and management" of their children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal citation omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has also concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property

8

rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights "is complete, final, irrevocable, and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. 747, 102 S. Ct. at 1391)); *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex. 1984)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2012); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex.2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 256, 264–66.

In conducting a legal-sufficiency review in a parental-rights termination case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which appellee, the Texas Department of Family and Protective Services ("DFPS"), bore the burden of proof.

9

*See id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 266).

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In order to terminate the parent-child relationship under section 161.001, a party must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination

10

is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

*Endangerment*

Under section 161.001(1)(E), a court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN . § 161.001(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Id.*; *see also Boyd*, 727 S.W.2d at 533. Although such endangerment requires more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The specific danger to the child's well-being may be inferred from parental misconduct standing alone.

*Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Here, several witnesses testified to appellant's gross neglect of the three children. Ballentine testified that when she visited the children in 2008, two were playing outside and unsupervised in very cold weather and the youngest was playing in "sewage," while appellant was inside the house, which smelled like marijuana. Ballentine noted that the children were malnourished and unkempt, and the two oldest children later told Ballentine that appellant would often leave them with Clayton, who would lock them outside all day so that they had "to use the bathroom outside." And the oldest child told Ballentine that appellant and Comeaux would lock the children in a bedroom for hours at a time, and the children were forced to defecate and urinate in an Easter basket.

Cook testified that the children told her that they were "restricted to a bedroom" and would have to "sneak to the bathroom." Appellant and Comeaux would often sleep until well into the afternoon, causing the children to miss school. And Cook was concerned that the children could not wake them if needed. Jones testified that the children reported to her the same behavior, and the oldest child had told her that they had lived in that manner for approximately two to four years. Moulder testified that the oldest child came into her office with a strong odor and told her that appellant "would lock her up in her room and would not let her

12

shower." Cooper-Fontenot testified that the oldest child complained of headaches as a result of not being fed at home. Tanner testified that the oldest child stated she was not allowed to eat until Sunday and wore clothes to school that their dog had urinated on. And the children's foster mother testified that one of the children had told her that appellant would have him wear the same clothes for six months without washing them. A parent's neglect of their children constitutes evidence that supports a finding of endangerment. *See, e.g., In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (stating that neglect "can be just as dangerous to the well-being of a child as direct physical abuse"); *In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.).

Furthermore, there is evidence that appellant used narcotics in a manner that endangered her children. As noted above, Barrentine testified that she smelled marijuana in the house where appellant was staying while two of the children were playing outside unsupervised in very cold weather. Appellant tested positive for cocaine use in December 2009 and February 2010, and medical records indicated that appellant was twenty-four weeks pregnant with her fourth child on February 26, 2010. Appellant admitted that she used cocaine or marijuana approximately once or twice a month from August to December of 2009. The oldest child told Jones that she had seen appellant use "coke," which she described as a white and "foamy" substance in appellant's nose. And the child told her foster mother that

13

appellant would take her money to spend on narcotics and have her accompany appellant and Comeaux when they went to purchase narcotics. A parent's use of narcotics may also constitute an endangering course of conduct. *See, e.g., In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re A.C.*, 394 S.W.3d 633, 641 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a "firm belief or conviction" that appellant's history of neglect, continued narcotics use, and exposure of her narcotic use to the children constituted a course of conduct that endangered the physical and emotional well-being of her children. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.P.B.*, 180 S.W.3d at 574.

Considering the entire record, appellant asserts that there "is no specific evidence that [her] drug use did actually affect her ability to parent." Although appellant testified that she did not use narcotics when the children were in her possession, Jones testified that the oldest child had seen appellant do "coke" and would take her along when purchasing narcotics. And Barrentine testified that she smelled marijuana in the house where appellant was staying while two of the children were kept outside unsupervised in very cold weather. The trial court was entitled to disbelieve appellant's testimony and resolve any conflicts or inconsistencies in the evidence. *See, e.g., In re R.W.*, 129 S.W.3d 732, 742 (Tex.

14

App.—Fort Worth 2004, pet. denied) (citing *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)). Thus, we conclude that, considering the entire record, the trial court could have reasonably formed a firm belief or conviction that appellant had engaged in a course of conduct that endangered the physical and emotional well-being of her children. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that appellant engaged in a course of conduct that endangered the physical or emotional well-being of the children.

We overrule appellant's first issue.

Having held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), we need not address appellant's arguments that the evidence is legally and factually insufficient to support the trial court's findings under section 161.001(1)(D) or section 161.001(1)(O). *See In re A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

*Best Interest*

In determining whether the termination of appellant's parental rights was in the children's best interest, we may consider several factors, including (1) the children's desires, (2) the current and future physical and emotional needs of the children, (3) the current and future physical danger to the children, (4) the parental abilities of appellant, (5) whether programs are available to assist appellant in promoting the best interests of the children, (6) plans for the children by appellant, (7) the stability of the home, (8) acts or omissions of appellant that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of appellant. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.*, 89 S.W.3d at 27.

In regard to the children's desires, Barrentine testified that she received a telephone call from the oldest child, who asked if she could live with her. Cook testified that the oldest child "has bonded with her foster family" and does not want to live with her mother. And one of the children also indicated that he wanted to remain with his foster family and was "pretty adamant" that "he did not want to return to his mother and most especially" Comeaux. Jones also testified

16

that the oldest child had "said she wanted to be adopted," and all three children expressed a desire to not return to appellant. Szabo testified that all three children "made their wishes known . . . that they wanted to live with the foster parents." The foster mother testified that the oldest child "very strongly does not want to return back to her mother," another "cries at the thought of having to go back" to live with appellant, and the third also wanted to stay with his foster family. Although the oldest child expressed a desire to be able to "see" their mother, another child told Cook that he only wanted to see appellant "a little bit," stating, "I don't want to go that far."

In regard to the current and future physical danger to the children, although Szabo stated that she was not aware of any "current conditions" in the home that would "cause any immediate danger to the children," there was, as stated above, evidence that appellant and Comeaux had a history of locking the children in a bedroom for hours at a time, which forced them to defecate and urinate in a basket, failing to change their clothes for up to six months at a time, failing to wash the children for days, and going long periods without feeding the children. Cook opined that there would be a "long-term detriment" to the children if they returned to their mother, stating that "it could be a life-threatening situation." In regard to appellant's parenting abilities, there is evidence that, in addition to the above neglect, appellant had used marijuana while the children played outside, and the

oldest child reported seeing appellant use "coke." Jones and Cook testified that the children told them that appellant and Comeaux would often sleep into the afternoon, causing the children to miss school. Cook further expressed concern that if the children "needed their mother's attention, they were unable to rouse her to get her to wake up."

In regard to the programs available to assist appellant, although appellant testified that she had a sponsor helping her with her alcohol and narcotics abuse issues and she had been going to therapy, there is also evidence that she continued to test positive for cocaine use after the children had been removed from her care. In regard to appellant's plans for the children, she testified that she would try to have Lorrie Comeaux, Timothy Comeaux's mother, named sole managing conservator of the children. Szabo testified that there were "issues" about whether Lorrie could protect the children because she "did not believe the allegations" of child abuse and "appeared to minimize the issues of substance abuse with her son."

In regard to the stability of her home, appellant testified that she was incarcerated at the time of trial and she would "count on" Timothy Comeaux to help "raise the children." However, Jones and Cook testified that the children were frightened of Comeaux. Jones noted that Comeaux had "hit [the oldest child] in the head with the door," leaving a "goose egg" on her forehead. She also testified that the children were told by Comeaux that they were "ugly." In regard to the acts

18

or omissions of appellant indicating that the parent-child relationship is improper, Cook testified that the children had "abandonment" issues with respect to appellant and the oldest child was "the parental figure for her younger siblings."

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a "firm belief or conviction" that termination of appellant's parental rights was in the children's best interest. Considering the entire record, we likewise conclude that the trial court could have formed a "firm belief or conviction" that termination of appellant's parental rights was in the children's best interest. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding.

We overrule appellant's second issue.

### Cook's Notes

In her third issue, appellant argues that the trial court erred in not allowing her trial counsel to review Cook's notes made in preparation for her testimony because she was entitled to review them. *See* TEX. R. EVID. 612. She asserts that the trial court failed to "properly understand the guiding rules and principles of Rule 612 and how it applied to the therapist's notes."

If a witness uses a writing to refresh her memory, an adverse party "is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the

19

testimony of the witness." *Id.* In civil cases where the witness refreshes their memory before testifying, the trial court has discretion to allow an adverse party to review the writing if it is "necessary in the interests of justice." *Id.* 612(2).

A trial court's decision to exclude evidence is reviewed under an abuse of discretion standard. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or in a way that is arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). In addition to showing an abuse of discretion, a party complaining of error in the exclusion of evidence must also show that the trial court's error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. *Alvarado*, 897 S.W.2d at 753–54; *see* TEX. R. APP. P. 44.1(a)(1). If the substance of the excluded evidence was before the court in other testimony, there is no reversible error. *Tex. Dep't. of Transp. v. Able*, 981 S.W.2d 765, 770 (Tex. App.—Houston [1st Dist.] 1998), *aff'd*, 35 S.W.3d 608 (Tex. 2000).

Here, Cook admitted that she reviewed her own notes before testifying. Appellant asked to see the notes pursuant to rule 612(2). However, the trial court, noting that Cook had already testified before the jury that she had reviewed her notes before testifying, denied appellant's request. Appellant later reurged her

request, but the trial court, after noting that Cook's testimony was cumulative of other testimony, denied the request.

After Cook reviewed her notes, she testified as to the children's confinement to a single bedroom, the wishes of the children, and the best interests of the children. The testimony of Barrentine, Jones, and the foster mother is consistent with the testimony of Cook. And the trial court specifically noted that because Cook reviewed her notes before testifying, it had the discretion to deny appellant access to them unless "necessary in the interests of justice." *See* TEX. R. EVID. 612(2). It also noted that Cook's notes were cumulative of testimony that had already been presented. On this record, we cannot conclude that the trial court's denial of appellant's request to view Cook's notes was arbitrary or unreasonable. Accordingly, we hold that the trial court did not abuse its discretion in denying appellant's request to see Cook's notes.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

21